## Dean *v.* State

No. 41058 November 17, 1958 106 So. 2d 501

*Ronald C. Brown,* Laurel, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

378

McGehee, C. J.

In this case the appellant, Allen Dean, Jr., a negro man about 23 years of age followed Bernice Pugh from a cafe to her home at 413 Van Buren Street in Laurel, Mississippi, where she lived with her three children, Edward Lawrence Pugh, age 4 years, Shirley Ann Hayes, age 18 months, and Bobbie Ann Hayes, age 7 months. It seems that her husband, Bernard Hayes, lived at Taylorsville, a town about 15 or 20 miles from Laurel. He was, therefore, not at home on the occasion in question.

Since the appellant assigns as error and seeks a reversal of his conviction for the murder of Shirley Ann Hayes, a negro child, on the grounds, (a) that the trial court refused to allow him to have a psychiatric examination at the Mississippi State Hospital at Whitfield, Mississippi, a distance of nearly 100 miles from Laurel, (b)

the overruling of appellant's motion for a continuance of the case for the term, (c) the overruling of the appellant's motion to squash the regular and special venires, (d) the admission of testimony as to the appellant's confession of the crime before any proof was made by the State as to the corpus delicti, (e) the admission of the testimony of Dr. Earl McRae as to the sanity of the accused, and (f) the overruling of his motion for a new trial, it is altogether essential that we relate the facts sufficiently to show that the State had established sufficient facts and circumstances to prove the corpus delicti, when considered in connection with the fact of the subsequent confession before any proof was offered as to the confession.

As heretofore stated, the appellant followed Bernice Pugh, the mother of Shirley Ann Hayes, to their home where the three children were in bed asleep; that she threatened to "call the law" if he didn't leave her premises and go on home; that the appellant had never been to or in her home prior to that occasion, and that she had only a speaking acquaintance with him; that the appellant went "on up the alley" and that she then began to prepare for bed; that upon hearing the loud barking of a dog at her window, and between her house and a vacant house next door, she looked out and saw the appellant peeping in her window, immediately after he left to go on up the alley; that she thereupon inquired of him as to what he was doing hanging around her house and that he told her: "You know what I want;" that she then, after threatening to call the law thought he had left, and then returned to the bedroom and undressed for bed except as to an underslip, and that she then put on her top coat and went out to get a bucket of water; that while returning she met the appellant; that they engaged in a struggle and that he almost tore off all her clothes, that she then ran into the house through the front door and latched the screen and that he then went to the back

door and demanded admission; that she refused to open the door and that he then kicked it open and came on into the house; that she then ran to the home of Ellery Smith and his wife, Irene, asking them for help; that it was then nearly 12 o'clock at night; that Ellery Smith was asleep when she first arrived; that Ellery ordered the appellant away from his house and demanded that he quit cursing and using the vile epithets toward Bernice Pugh; that Ellery Smith ordered the appellant to leave his home when he was insisting that Bernice Pugh come outside to where he was; that she, Bernice Pugh, tried to go out the back door of the Ellery Smith home but was headed off by the appellant and that she then ran out at the front door and left; that she went from there to the home of R. A. Boyd who lived at 412 Van Buren Street where his daughter, Bonnie Mae Flowers, was residing with him; that they both heard her insisting that the appellant, who had followed her to the Boyd house, should leave her premises, which was next door to the Boyd house; that R. A. Boyd advised the witness to report him to the police; that she told the appellant that she was going to report him to the police if he didn't leave and that he thereupon told her that if she was going to get the officers "she had better bring more than one"; and that she then went to "Nick's Cafe", called the police and returned to her home upon the assurance of the officers that they would come immediately; that two policemen, Messrs. Landrum and Ellzey arrived at her home and that by that time she had discovered that Shirley Ann Hayes was missing from her bed.

The two officers thereupon began a thorough search for the missing child, went to the home of the appellant, looking for him since the little four-year old boy, Lawrence Pugh, had told the officers that the appellant had carried Shirley Ann Hayes out of the house through the back door. The officers failed to find the appellant at his home where he lived with his father, and thereupon

returned to Bernice Pugh's house and made a thorough search of the entire premises for the child; and that upon failing to find the child anywhere about the premises they returned to where the appellant lived and found that he had then returned home. These officers stated to him that "they had to find the baby" and that at first he denied any knowledge of the whereabouts of the child. But upon being confronted with the facts that the officers already knew, or as to which they had been informed, the appellant then stated that "I will go and show you where the child is." He led them near to the scene of the child's murder and stated that "she is right over there", pointing to where they immediately found the child. They found that the child was dead and saw choke marks about its neck and that it was bleeding profusely, and they were then informed by the child's mother that it had no bruises or other signs of violence on its body when she put it to bed.

The proof further shows that the officers then carried the appellant to the police station and it was not until that time that they asked him whether or not he would be willing to make a statement about the matter. They said that he then dropped his head for a moment and then spoke up and said, "Yes, I will make a statement." Of course, the State had shown by the officers that no coercion, promises, or hope of reward or leniency had been made to him to induce the confession, and their testimony in this respect was wholly uncontradicted by any witness in the case, although the appellant was offered the opportunity before the court out of the presence of the jury to offer any testimony that he desired to offer as to whether or not the confession that was to be related to the jury by the officers was made freely and voluntarily.

The proof shows that the appellant then proceeded to state to the officers that he first assaulted the child's mother at her home and that she got away from him and that he then took the child out of its bed and carried it to

the scene of the crime; that he led the way for the officers down an alley and along a ditch, which had been excavated in connection with the construction of a freeway through the City of Laurel, and when he got near where the child was he told the officers ''She is right over there,'' and pointed in the direction. The officers confirmed the information given to them by the appellant, found that the child was dead and saw the signs of violence on its throat and elsewhere. Moreover, the appellant stated to them that in connection with the crime that he committed against the child he choked it until it quit crying. The facts in regard to the crime against the child are too gruesome and revolting to here relate. They were testified to by Dr. McRae in connection with his examination of the child at his clinic shortly after the commission of the crime.

 █ We are, therefore, of the opinion that aside from the testimony of Dr. McRae the proof was ample to show the corpus delicti before any evidence was introduced before the jury as to the free and voluntary confession made by the appellant. This Court has held in a number of cases that the proof as to the corpus delicti need not be as strong when supplemented by a free and voluntary confession as it would be required to be in other cases.

The murder of Shirley Ann Hayes occurred on the night of April 6, 1958. The appellant was indicted for two capital crimes in connection with her death and the indictments were returned on April 9, 1958, but an attorney was appointed on April 7, 1958 to defend the appellant, and the attorney was thereupon so advised of such appointment.

The regular term of the court was then in session and the crime was committed during the fourth week of the four-week term of the court. On April 11, 1958, the attorney filed a motion asking the court to defer the arraignment of the accused and on that same date he also

filed a motion for the court to order a physical examination of the defendant to determine if he was then physically able to take part in the defense of the indictments against him. In the first motion it was stated that the defendant was "suffering from bad tonsils, which are swollen." The court appointed a doctor to treat the appellant for his condition, and the record before us shows that on April 10, that the appellant was found by the local doctor to be suffering from acute tonsilitis; that penicillin had been given and aspirin ordered and that the examination by the doctor disclosed that the appellant had greatly improved and that penicillin had been given and the aspirin continued.

On April 12, 1958, the appellant through his attorney filed a suggestion of insanity and a motion for a psychoanalysis of the defendant, and requested that the defendant be examined by Dr. J. J. Head, a member of the staff of the Mississippi State Hospital for the Insane at Whitfield, Mississippi, and that Dr. Head be subpoenaed as a witness for the trial of the case and asked that he be permitted to sit through the whole trial and at the conclusion thereof testify as an expert witness based upon his examination of the defendant and his observance of the defendant during the trial.

The defendant on two occasions on and prior to April 14, 1958, had declined to plead to the indictments, but stood mute, and thereupon the court ordered the clerk to enter on the court minutes an order directing a plea of not guilty for the defendant, and set the trial for Thursday, April 17, 1958. A subpoena was issued for Dr. Head but he failed to appear upon the date specified for the trial. The defendant did not avail himself of an attachment for the compulsory attendance of the witness as he could have done.

In the meantime on April 14, 1958, the trial judge sustained a motion of the district attorney for a special venire to try the case, and in which order it was

recited that a special venire facias be issued by the clerk and directed to the sheriff to summon qualified electors not exceeding twenty from Beats Two and Three of the Second Judicial District of Jones County, and further reciting that eleven jurors had been drawn from Beat One of the said district which exhausted the jury box from Beat One, and the clerk was directed to issue the writ to the sheriff to summon nine additional jurors from Beat One making a total of sixty jurors for the special venire.

Objection is made by the appellant that the sheriff should not have been permitted to go out into these three beats, all of which comprised the second judicial district of the county, and summon the jurors, without all of them having been drawn from the jury boxes. We are of the opinion that under Section 1795, Code of 1942, the procedure followed by the court is fully authorized and that, therefore, there was no error committed by the court in overruling the motion to quash the regular venire and the special venire.

The court prior to the expiration of the four-week term of the regular term of court entered an order extending the term of the court for an additional week, and it was on Thursday during this additional week that the case was tried.

▇▇ The motion of the defendant for a continuance of the case for the term did not comply with the requirements of Section 1520, Code of 1942, which requires that: "On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or presence of the absent witness, as the case may be, stating in what such diligence consists; and that the continuance is not sought for delay only, but that justice may be done. The

court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. The attorneys for the other side may also cross-examine and may introduce evidence by affidavit or otherwise for the purpose of showing to the court that a continuance should be denied. * * * * A denial of the continuance shall not be ground for reversal unless the Supreme Court shall be satisfied that injustice resulted therefrom.'' See Gatlin v. State 219 Miss. 167, 68 So. 2d 291; Williams v. State 92 Miss. 70, 45 So. 146; Vollm v. State 96 Miss. 651, 51 So. 275; Solomon v. State 71 Miss. 567, 14 So. 461; Lipscomb v. State 76 Miss. 223, 25 So. 158; Cox v. State 138 Miss. 370, 103 So. 129 (citing Lamar v. State 63 Miss. 265, and other cases including Richburger v. State 90 Miss. 806, 44 So. 772.) Also see the numerous other cases cited in the annotation under Sec. 1520, Code of 1942.

Moreover, all capital cases are required to be tried during the term at which an indictment is returned, unless good cause be shown to the contrary.

We gather from the record in this case that two indictments were returned against the defendant for capital felonies and he was tried on the indictment for murder ten days after an attorney had been appointed to defend him and eleven days after the commission of the crime, the trial having been commenced on April 17, 1958 and having ended on April 18, 1958, and with the result that the defendant was convicted and sentenced to death for murder.

We find no reversible error in the record of this trial and we think that the proof amply sustains the verdict of guilty, and warranted the jury in not fixing the punishment at life imprisonment but returning a verdict which made it mandatory upon the trial court to sentence the defendant to death.

It was also assigned as error the admission of the testimony of Dr. McRae as to the sanity of the de-

fendant. The court had appointed Dr. McRae and Dr. Shelby Mitchell, both reputable doctors in the City of Laurel to examine the accused on the issue of insanity and directed them to make their report available to the State and to the defense, and which was accordingly done. The court found that Dr. McRae had had experience in the examination and treatment of mental cases while in the army and that Dr. Mitchell had had experience as a member of the staff of the Mississippi Colony for the Feebleminded at Ellisville, Mississippi, and these two doctors concurred in the finding that the accused was sane both at the time of the trial and at the time of the commission of the crime.

As to the suggestion of insanity, there is not one iota of testimony that the defendant had ever been known to commit an abnormal act prior to this brutal, gruesome and willful murder of his victim. The defendant did not testify and did not offer any relative, friend or acquaintance to support his suggestion of insanity either at the time of the commission of the crime or at the time of the trial therefor.

Nor had it been suggested that the accused had been mistreated and thereby coerced into a confession, until such suggestion was made on the day of the trial and then no proof was offered in that behalf.

Finally, it is assigned as error the action of the court in overruling the appellant's motion for a new trial, which assigned the grounds hereinbefore discussed and the granting and refusal of certain instructions. We find that no error was committed in that regard.

The motion for a new trial did not assign as a ground therefor that the verdict was against the overwhelming weight of the evidence, but even if it had done so, there would have been no merit in such ground for a new trial, since the evidence was wholly undisputed, and proved the guilt of the defendant beyond every reasonable doubt and to a moral certainty.

The judgment and sentence of the trial court must, therefore, be affirmed, and Friday, December 19, 1958, is hereby fixed as the date for the execution of the death sentence.

Affirmed.

All nine of the Justices concur.