Rush *v.* State

No. 43295 February 7, 1966 182 So. 2d 214

*Laurel G. Weir*, Philadelphia, for appellant.

*R. Hugo Newcomb, Sr.,* Asst. Atty. Gen., Jackson, for appellee.

INZER, J.

Appellant, James L. Rush, was indicted, tried and convicted in the Circuit Court of Neshoba County on a charge of assault and battery, with the intent to kill and murder Paul Stokes. He was sentenced to serve a term of ten years in the state penitentiary. From this conviction and sentence he appeals to this Court.

Appellant makes the following assignment of errors:

1. The verdict of the jury is contrary to the overwhelming weight of the law and evidence and is not supported by any law or evidence.

2. The Court erred in overuling (sic) the motion for new trial.

3. The Court erred in granting every instruction granted to the State and in refusing every instruction refused appellee as shown by the record.

4. The Court erred in sustaining every objection made by the State and in overruling every instruction refused appellant as shown by the record.

5. The Court erred in refusing appellant a continuance.

6. The Court erred in allowing appellant to be tried on the indictment brought from the files without requiring a new indictment.

7. The Court erred in not causing appellant to be represented by an attorney and in not having him and his attorney present at all times.

8. The judgment of the Court is erroneous for the many other reasons apparent upon the face of the record and to be shown on a hearing of this appeal.

The proof on behalf of the state shows that in April, 1962, appellant was living in a tenant house on the farm of Paul Stokes in Neshoba County. Appellant had made a crop on the farm the year before, but did not contract to make a crop for the year 1962. He was working for Stokes and others when needed. The house in which appellant lived was about three-fourths of a mile from the home of Stokes. On Sunday, April 15, 1962, Stokes went to the house where appellant lived to see appellant about doing some work for his father-in-law the next day. When he reached the house he knocked on the floor of the front porch, and appellant's wife came to the door. Stokes asked where appellant was, and upon being informed that he was in the house, Stokes asked her to tell him to come out. At about that time, appellant came out the door with a 22-caliber rifle in his hand, and said to Stokes, according to the testimony of Stokes, "I am going to kill you." Stokes ran around to the rear of the house, and appellant followed him, and shot him between the shoulders. Stokes was knocked to the ground, and appellant threw his rifle down and ran over and jumped on Stokes, and started hitting him. Stokes managed to get up, and appellant picked up the rifle and went back into the house. Stokes started home, and when he was about half way there, appellant came up behind him and shot him

two other times. One shot hit Stokes in the right hip and the other in the upper part of the leg. These shots knocked Stokes to the ground, and appellant came up to him and drew the rifle on him, and told him, "Let's go." Appellant then made Stokes go back to his house with him. On their way to the house, a car driven by Walter Steele drove up. Appellant pointed the gun at Steele, and waved him back. Steele backed his car to the main road and left. Stokes told appellant that he had to have a doctor, and appellant agreed to go to Stokes' home. They started to Stokes' house, and on their way, they met a car in which Ross Ford and Chet Ford were riding. Appellant waved his rifle at them and told them to go on by. After they reached Stokes' home, they went into the back yard, and Burnice Cook and Adam Stewart drove up into the driveway. Appellant halted them, and after about fifteen to twenty minutes, Cook and Stewart prevailed upon appellant to let Stokes go to the hospital. During all this time, appellant had the rifle drawn on Stokes. Cook then drove Stokes to the hospital, and appellant went back to his home. Appellant informed Cook and Stewart that he would surrender to the sheriff when he came. Mr. E. G. Barnett, the Sheriff of Neshoba County, received a call about the trouble and went to investigate. He found appellant at his home, and appellant informed him that he had messed up and was ready to go. The rifle was leaning on the door of the porch, and the sheriff picked it up. He then put appellant into his car, and carried him to jail. The sheriff then went back to the home of appellant to make a further investigation. In back of the house he saw a place that looked like some scrambling had taken place. He also saw some spots of blood and found an empty rifle cartridge. He went through the house, but saw no evidence of any disorder therein. He did find some rifle cartridges lying on the bed. He found no evidence of any blood or struggle inside of the house.

Appellant remained in jail from April 15 until in August, when he was carried to the Neshoba County Hospital. He had at that time what is described as a spell or seizure, and it was thought that he had spinal meningitis; however, it developed that he did not have this trouble. Later, on an order of the circuit judge, he was sent to Mississippi State Hospital at Whitfield for a mental examination. He was admitted to the hospital at Whitfield on August 21, 1962, and on August 24, 1962, he was operated on for a hemorrhage of one of the blood vessels in his brain. On October 10, 1962, it was determined by the doctors at the hospital that appellant was insane. Appellant remained in the hospital, and his condition gradually improved until he was discharged from the hospital in November 1963 as being cured and sane. He was returned to the Neshoba County jail where he remained until he was tried.

At the September 1962 Term of the Circuit Court of Neshoba County, appellant was indicted; he was in the mental institution at that time. At the February 1963 Term of the court, appellant was still in the hospital, and the case was continued. At the September 1963 Term of the court, an order was entered on the motion of the district attorney to carry the case against appellant to the files.

After appellant was returned to the jail in Neshoba County, he employed counsel to represent him. This was done several weeks prior to the February 1964 Term of the court at which he was tried. On Thursday of the first week of the February 1964 Term of the court, a motion was sustained to revive the case and restore it to the active criminal docket. On the same date appellant was arraigned and entered a plea of not guilty. The arraignment was in open court, and appellant's counsel was with him at the time he was arraigned. The court fixed the amount of bail bond, and the case was set for trial on Wednesday of the following week.

■■ ■ On the day set for trial, counsel for appellant filed a motion to quash the proceedings and also a motion for continuance. The basis for the motion to quash be tried on the indictment that had been retired to the files was taken without appellant being present and that the action reviving the cause or restoring it to the active docket was done in the absence of appellant and his counsel. It was contended that appellant could not be tried on the indictment that had been retried to the files and that the grand jury had refused to reindict appellant. Testimony was taken on this motion, and the trial judge rendered an opinion which was dictated into the record. He held that the defendant and his attorney were present in court when the motion to revive the cause was sustained, and that retiring the case to the files did not amount to *nolle prosequi* of the indictment. The overruling of this motion to quash is assigned as one of the errors on this appeal. We find that the motion to quash was properly overruled. The passing of an indictment to the files is not an acquittal or a *nolle prosequi* of the indictment. The district attorney may at any future term of the court move to withdraw the indictment from the files, and the court is at liberty to sustain the same. When the motion is sustained the indictment again becomes a part of the active cases subject to trial. Byrd v. State, 179 Miss. 336, 175 So. 190 (1937); Gordon v. State, 127 Miss. 396, 90 So. 75 (1921).

The court then overruled the motion of the defendant for a continuance, and this action is also assigned as error. The motion as made is as follows:

The adult defendant in this cause, James L. Rush, moves the court to continue this cause until a later date and until the next regular term of this Court for the reasons that several of his vital witnesses to prove vital points in his defense are not present in Court.

The only eyewitness to the alleged crime other than defendant and the prosecuting witness is Elmira Rush, the wife of defendant and he desires her presence in Court to prove that the defendant was insane at the time of the shooting and did not know right from wrong and that the shooting was justifiable or was without malice aforethought or intent to kill and murder because of actions of the prosecuting witness towards her and that process for her appearance has been diligently issued, but she has not been served with said process and is not present in Court, but she can be here to testify to said facts at the next term of this Court and she is the only witness defendant can prove said facts by.

Defendant Moves the Court to continue this cause to a later date so his vital and necessary witnesses can be present.

 █ It may be readily observed that the motion, as made, does not comply with the provisions of Mississippi Code Annotated section 1520 (1942) relative to continuances. In none of the cases cited by appellant, or in any that we have been able to find, has this Court held that the trial judge abused his discretion in overruling a motion for a continuance unless there had been a substantial compliance with this statute. In this case it was the duty of the appellant to show in his motion the whereabouts of his wife. If she was in the county, and if the sheriff had failed to serve her, he should have asked for an alias subpoena, and made diligent effort to secure her presence. The facts he expected to prove by her should have been clearly set out so that the trial judge would have an opportunity to ascertain whether they were material. He should have shown that she was not absent by the consent or procurement of appellant. After the motion was overruled the duty was upon the appellant to persist in his efforts to get this witness for a hearing on the motion for a new trial. In other words, it was the duty of the appellant to show that he was

diligent in his efforts to secure the presence of this witness. We have emphasized the importance of complying with this statute when a motion for continuance has been filed. Some of the cases reflecting our admonition in this regard are Dean v. State, 234 Miss. 375, 106 So. 2d 501 (1958); Bone v. State, 207 Miss. 20, 41 So. 2d 347 (1949); Ogden v. State, 174 Miss. 119, 164 So. 6 (1935); Ware v. State, 133 Miss. 837, 98 So. 229 (1923); Lamar v. State, 63 Miss. 265 (1885). We are constrained to hold that the trial judge did not abuse his discretion when he overruled appellant's motion for a continuance.

Appellant testified in his own behalf, and said that in December 1962 which was some four months prior to the date of the shooting, that he had had trouble with his head and had blackout spells. After one of these blackout spells, he went to Matty Hersee Hospital in Meridian, where he remained about fifteen or sixteen days. He said that after his release from the hospital his condition became worse and that Stokes had started going with his wife. He also said that about three weeks before the shooting he had a conversation with Stokes, and at that time, Stokes threatened to kill him. He tried to get his wife to move away, but according to his testimony, she refused to do so. He testified that on April 15, 1962, he came into the back door of his home and found Stokes on top of his wife on the floor of the bedroom. He said that they were on the floor between the two beds that were in the room. He first said that he had a gun with him and that he shot Stokes. He later said that he did not remember anything after he opened the back door, and that he did not remember anything else until he was in jail. On cross-examination he said that he remembered shooting Stokes, and that the reason he shot him was that Stokes had threatened his life, and that he was afraid of him. He later denied that he shot Stokes. He did not remember going to the hospital in Neshoba County or to the hospital at Whit-

field. He said that after he could remember, he realized that they had operated on his head.

Dr. David L. Davidson testified as a witness on behalf of appellant. Dr. Davidson is a psychiatrist and has been on the staff at the Mississippi State Hospital at Whitfield for more than ten years prior to the trial. He testified that appellant was admitted to the hospital at Whitfield on August 21, and was operated on for a hemorrhage of a blood vessel in his brain on August 24. His first examination of appellant was on September 10, 1962, and he continued to see him after that time. On October 11, 1962, it was determined by the staff at the hospital that the appellant was insane. Appellant stayed in the hospital until November 1963 during which time his condition gradually improved, and he was discharged as being sane. Dr. Davidson further testified as to the effect of the bleeding of a blood vessel, and it was his opinion that if appellant had suffered a blackout spell prior to the shooting, it could have easily brought about a confused state of mind, and that any stress or strain could make his condition worse, to the extent that he would not know right from wrong. He was unable to express any opinion as to appellant's mental condition on April 15, 1962, the date of the shooting, but he said from the history of his illness that he had received, that it was his opinion that if appellant had started having headaches at the age of twelve years, that this could have been the beginning of his mental trouble. It was his opinion that this condition would have grown gradually worse and that his sanity would come and go.

Several other witnesses testified in behalf of appellant, including his father, mother and neighbors. They testified relative to his mental condition and as to his reputation in the community for peace and violence. The gist of their testimony was that the appellant had a good reputation for peace and violence, and in their opinion, at the time of the shooting on April 15, 1962,

that appellant did not know right from wrong. One of the witnesses said that appellant was just crazy, but none saw him on the day of the shooting. His mother and father did see him on the day before the shooting, and they said that he was not acting right, and in their opinion, he did not know right from wrong at that time.

Dr. Pete H. Rhymes also testified on behalf of appellant. He first saw him on August 4, 1962, at the Neshoba County jail. Appellant was unconscious at that time, having had what was described to the doctor as an epileptic fit or a seizure. Dr. Rhymes had him admitted to the Neshoba County Hospital where appellant remained in a partial coma until he was transferred to the Mississippi State Hospital at Whitfield. He said appellant was never completely rational during this period, and it was his opinion that if what he was told was correct, that appellant's trouble first started in November or December prior to the time he saw him in August. He was unable to give any opinion as to appellant's mental condition on April 15, 1962.

Several witnesses testified on behalf of the state as to appellant's mental condition on April 15, 1962. All of those who saw him on that date said that, in their opinion, he was rational and sane. Mrs. H. V. M. Herring who was the jailer where he was incarcerated saw him daily from the time he was put in jail until August 4, and she said that during this time he appeared to be normal until he had the seizure on August 4, 1962.

██ ██ It is apparent that the evidence on behalf of the state and that upon behalf of the appellant made it a jury issue as to whether appellant was sane or insane at the time of the shooting. The court instructed the jury on behalf of the defendant that if there was any reasonable doubt, either from the evidence or lack of evidence, as to whether the appellant was sane or did not know right from wrong, when he shot Stokes, then in that event it was their sworn duty to find the

defendant not guilty. The jury determined this issue, and we cannot say that such determination is against the overwhelming weight of the evidence. There was ample evidence to support the finding of the jury, and the trial court was not in error in overruling the motion for a new trial.

 █ Appellant assigns as error the action of the court in sustaining every objection made by the state, and overruling every objection made by appellant as shown by the record. We have heretofore commented on and condemned this type of an assignment of error. The rules of this Court require that error complained of be set out separately and pointed out with certainty.

 █ We have carefully considered not only those matters particularly pointed out in appellant's brief, but also the entire record in this case relative to the action of the trial court in sustaining and overruling objection to evidence that affected defendant's rights. We find no reversible error on the part of the court. In many instances where objections were sustained to questions propounded to witnesses on direct examination by counsel for appellant, the witness had already testified to those facts or the same questions had already been asked in another form. We have carefully examined the record relative to the cross-examination of appellant, and we find that appellant was cross-examined rather extensively, and many questions were asked relative to immaterial matter, but these questions were for the apparent purpose of testing appellant's recollection of the things that had happened prior to, and on the date of, the shooting. When a defendant takes the stand and testifies in his own behalf, he subjects himself to cross-examination. The fact that such cross-examination is vigorous is not objectionable so long as it is not abusive, and is confined to the proper scope. We said in Jones v. State, 222 Miss. 387, 395, 76 So. 2d 201, 202 (1954) that:

When a witness voluntarily takes the stand and testifies, he is subject to cross-examination and so long

as there is no abuse of the privilege of cross-examination and no prejudice results therefrom except such prejudice as might arise from disclosing the truth, the severity of the cross-examination is no ground for a reversal.

■■ ■ Under the laws of this state, wide latitude is allowed in cross-examining a witness, and the cross-examination is not confined to matters which the witness has testified about on direct examination. We said in Prewitt v. State, 156 Miss. 731, 735, 126 So. 824, 825 (1930) that:

It is of the utmost importance in the administration of justice that the right of cross-examination be preserved unimpaired. It is the law's most useful weapon against fabrication and falsehood. As a test of the accuracy, truthfulness, and credibility of testimony, there is no other means as effective. In this state, cross-examination is allowed coextensive with the issues, Walton v. State, 87 Miss. 303, 39 So. 689; not only, but it may proceed into the collateral circumstances sourrounding, or in any way affecting, the transaction to the full extent that they have relevant connection by way of testing the memory, accuracy, sincerity, interest, or bias of the witness. In all these matters the privilege of counsel rightfully has broad latitude, and, to make it fully effective towards the purposes for which the law allows and favors it, the privilege should not be interfered with or hampered or restricted by the trial judge, except in clear case of irrelevancy, trespass beyond admissible ground, or extremes of continual, aimless repetition. 1 Thomp. on Trials, sections 406, 415-419.

We find no reversible error relative to the cross-examination of appellant.

■■ ■ Appellant also contends that the court was in error in refusing to allow Dr. Davidson to answer a hypothetical question relative to when appellant's men-

tal condition began. The court sustained the objection to the hypothetical question propounded for the reason that the question as asked did not contain all the necessary facts. The objection was properly sustained; however, the doctor had already testified that if appellant started having headaches at the age of twelve years that this could have been the beginning of his trouble. We do not think that the court unduly restricted the doctor in his testimony.

Appellant also assigns as error the granting of every instruction granted to the state in refusing every instruction refused the appellant. The court granted every instruction requested by the defendant, except an instruction directing the jury to find the defendant not guilty. Appellant, in his brief, points to only one instruction granted the state in which he contends there was error. When this instruction is read, together with the other instructions granted to the state and those granted to the defendant, we find no reversible error. The instructions taken as a whole correctly stated the law relative to the issues involved, and the court was liberal toward the defendant in granting the instructions he requested.

We have carefully examined and considered the record in this case, together with the brief on behalf of the appellant and the state, and we find no reversible error. For this reason, this case must be affirmed.

Affirmed.

*Ethridge, C. J., and Gillespie, Jones and Brady, JJ.,* concur.