207 So.2d 108 (1968)
Johnny Benjamin HARVEY
v.
STATE of Mississippi.
No. 44669.
Supreme Court of Mississippi.
February 19, 1968.
*109 Evans & Sykes, Gulfport, for appellant.
Joe T. Patterson, Atty. Gen., by Guy N. Rogers, Asst. Atty. Gen., Jackson, for appellee.
RODGERS, Justice:
The appellant, an eighteen-year-old boy was indicted, tried and convicted of the crime of "fondling." He was sentenced to serve a term of one year in the Mississippi State Penitentiary; and from this judgment and sentence imposed in the County Court of Harrison County, Mississippi, he has appealed to this Court.
It is not seriously contended that the defendant did not do the acts or commit the assault alleged to have been committed upon the person of Alberta Walker, a four-year-old female child. The mental responsibility of the defendant for the crime charged and defendant's mental capacity to give a written confession are the two real issues to be determined on this appeal.
During the trial the prosecution offered the testimony of the prosecutrix and other corroborative evidence, and in the absence of the jury the State offered a written confession of the defendant. The court admitted the confession over the objection of the defendant, and the evidence of the confession was then presented to the jury. The defendant declined to offer proof as to the voluntariness of the confession in the absence of the jury. During the testimony of the State, on the question of voluntariness, to the trial judge, the defendant stressed the question as to whether or not the defendant fully understood that he was waiving his constitutional right to have an attorney present during the inquiry, and whether or not the prisoner understood the gravity of the crime with which he was being charged. The officers testified that the defendant "naturally was shook up a little bit, excited about it, but he did not hesitate when we explained his rights to him to go ahead and tell us. He did not want a lawyer, he didn't want to call a lawyer, and that he would give us a statement and sign the statement." The officers said, "He was more than willing to give us a statement for at the time he appeared like he didn't think there was nothing to it, nohow."
After the State had rested its case, the defendant offered the testimony of a psychiatrist who testified that the defendant was moderately mentally defective, but without psychosis or true mental disease. He testified that the defendant did not have sufficient capacity to distinguish right from wrong on the date of the alleged crime. He testified that the defendant would be a "menace to society" and that his deficiency is such that he is not sufficiently aware of right and wrong and would have a "good chance" of repeating the crime. He testified that he did not believe that the defendant had mental capacity to understand completely what he signed.
A psychologist testified that the defendant had a general intelligence quotient of 60, and that:
"This would indicate that he is right on the line between mild-mental-retardation and moderate mental-retardation, in other words, the score that he obtained *110 on the test would indicate that he is in the category of the mild to moderate mental defective."
The doctor further stated that the defendant was suffering from "brain disfunction" or "brain damage"; and:
"(W)hen he is feeling good and he is in a secure environment, he can function like an eleven or twelve-year-old boy which is really fairly intelligent. * * * (B)ut when he is upset, the efficiency of his thinking drops down to the severe mentally retarded and he could not handle anything. He couldn't even sweep a room out if he was upset."
The doctor testified that he had a mental age of eight to nine or ten to eleven years of age, and that he would not be able to maintain the mentality of an eleven-year-old. He said, however, that the defendant was not psychotic, neither schizophrenic nor depressive, that he did not have enough mentality to be psychotic. Finally the doctor said that when this patient was worried he had the mind of a five-year-old child.
The testimony in this record shows that the defendant finished the eighth grade in school; however, his teacher testified that he was not capable of passing but that he was passed "socially but not academically". Some of the witnesses testified that the defendant crawled through windows when he visited them and others testified that he always had a pack of "alley dogs" following him.
The grandmother of the prosecutrix testified that the child changed her story as to the alleged assault. The State in rebuttal offered officers and lay witnesses to testify as to their opinion with reference to whether or not the defendant was sane. A psychiatrist was permitted to give his opinion based upon a hypothetical question giving the history of evidence introduced in the case, and this witness testified that assuming that testimony to be true, the defendant knew the difference between right and wrong at the time of the alleged assault. During the trial it was stipulated that the defendant had been admitted to the Mississippi State Hospital at Whitfield, where he was examined by the staff of psychiatrists. The report of the hospital authorities was introduced into evidence by agreement, and on order of the court. The report stated that the patient was found to be without psychosis. The entire record of the hospital was introduced showing the questions and answers which occurred between the doctors and the defendant.
The trial court was requested to grant, but would not grant, the defendant an instruction based upon the lack of capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of law.

I.
The appellant challenges the adequacy of the current test being used in this state as a guide by which the jury may determine the criminal responsibility of persons charged with crimes. It may be helpful to review the history of this problem.
All civilized society from early antiquity has recognized that in order to hold persons responsible for crime it was necessary for such persons to have sufficient mental understanding to form a criminal intent. This rule was known as "actus non reum facit nisi mens sit rea," which means: An act does not make a person guilty unless his intention be also guilty. It is often referred to in textbooks as the "mens sit rea" rule. Children, of course, were exempt because they obviously did not understand the consequence of their acts. It was pointed out by Dr. Dearman in his article on criminal responsibility printed in 47 Virginia Law Review 1388, 1389 (1961).
"The question of mens rea, or `guilty mind,' has been a problem with which medicine and the law have been struggling almost since the beginning of recorded *111 history. It was first mentioned as a legal principle in the Code of Hammurabi, which was written about 1790 B.C. In this Code if one man killed another and swore that it was unintentional, he was merely fined according to the rank of the deceased.
"The early record of insanity as a defense occurred in Mohammedan law about 622 A.D. In this Code there was no concept of demoniacal possession as the cause of mental illness. Here for the first time a slaying committed by a person who was mentally ill was considered involuntary homicide."
The trial judges from an early date began to exempt from criminal punishment not only children but adult persons who were idiots, mental deficients or insane persons, because they too were unable to understand or form a criminal intent. Many of the great English judges and English law writers wrote on this subject. Coke, Hale, Blackstone and others have written upon the subject of madmen, non compos mentis, and dementia. In 1724 A.D. in the English Arnold's Case, 16 How.St.Tr. 695, Justice Tracy announced the "wild beast" test for legal sanity by saying:
"[I]t must be a man that is totally deprived of his understanding and memory, and doth not know what he is doing, no more than an infant, than a brute or wild beast. Such a one is never the object of punishment."
In Arnold's case, the court also used the phrase "able to distinguish between good and evil."
In 1800 Hadfield shot at King George III of England in Drury Lane Theater. The attorney general prosecuted the case and insisted upon the old test, "the total deprivation of understanding and memory." The defense counsel, Erskine, insisted that insanity was to be determined by the fact of fixed insane delusions. The defendant was acquitted, and since that time the term, "the delusion test," has been referred to by many courts. 1 Burdick, Law of Crime § 209 (1946).
The "fixed insane delusion test" of sanity was pled in the famous M'Naghten's Case, 10 Clark & F. 200, 8 Eng.Rep. 718 (1843). In 1843 M'Naghten, a Scotchman, was tried for the murder of Mr. Drummond, a private secretary of Sir Robert Peel. He was under the insane delusion that Peel had injured him and believed Drummond to be Peel. He killed him. He was acquitted on the ground of insanity. The public was very much aroused. There was a long debate in the House of Lords resulting in there being submitted to the English Judges five questions, two of them being what issues should be submitted to a jury when a person is afflicted with insane delusions, and in what terms ought the question be left to the jury as to the prisoner's state of mind at the time the act was committed. Chief Justice Tyndall wrote the reply for the fifteen Judges of England:
"As the second and third questions appear to us to be more conveniently answered together, we submit our opinion to be that the jury ought to be told in all cases that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction. That, to establish a defense on the ground of insanity, it must be clearly proved that at the time of committing of the act the accused was laboring under such a defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it that he did not know that he was doing what was wrong."
The test thus enunciated by the English Judges in that case, the "right and wrong test," is applicable today in England, Canada, and practically all of the American states. Much discussion has been engendered as to whether or not the wrong was "moral or legal wrong," and what is meant by the word "diseased." Judge Cardozo's *112 opinion in People v. Schmidt, 216 N.Y. 324, 110 N.E. 945, L.R.A. 1916D 519, (1915), gives a fine historical background of the legal test for the defense of insanity. He rejected the instruction that the defendant was acting under the "delusion of a divine command." He said:
"The variance must have its origin in some disease of the mind. [citing case] The anarchist is not at liberty to break the law because he reasons that all government is wrong. The devotee of a religious cult that enjoins polygamy or human sacrifice as a duty is not thereby relieved from responsibility before the law. [citing cases] In such cases the belief, however false according to our own standards, is not the product of disease. * * * We can safely leave such fabrications to the common sense of juries." Id. at 340, 110 N.E. at 950.
The court thus rejected the theory that a distinction should be made between "legal" and "moral wrong."
The defense of insanity based upon the so-called M'Naghten rule was seriously criticized in State v. Jones, 50 N.H. 369 (1871). In that case the court permitted the jury to consider whether or not the defendant had an uncontrollable, insane impulse to kill his wife and pointed out that when such an impulse was the result of a disease, the disease produced the act. The opinion stated, however, that if he could have controlled it [his impulse], then his act was not caused by disease, but by the concurrence of his will, and was therefore crime. New Hampshire recognizes no particular test for the determination of the question of insanity in a criminal case, but leaves the jury to determine, from all the facts, whether or not the accused was capable of a criminal intent at the time.
There are twenty-one states where the irresistible impulse is recognized, including our sister state of Alabama. See 1 Burdick, Law of Crime § 212 (1946). Judge Burger of the United States Court of Appeals, District of Columbia Circuit, said in footnote 29 on page 869 of his concurring opinion in Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853 (1961), that the opinion written by Justice Somerville in Parsons v. State, 81 Ala. 577, 2 So. 854 (1887), "remains to this date perhaps the most comprehensive American judicial opinion ever written on the subject of criminal responsibility." Justice Somerville said in part:
"In conclusion of this branch of the subject, that we may not be misunderstood, we think it follows very clearly from what we have said, that the inquiries to be submitted to the jury, then, in every criminal trial where the defense of insanity is interposed, are these:
"First. Was the defendant at the time of the commission of the alleged crime, as matter of fact, afflicted with a disease of the mind, so as to be either idiotic, or otherwise insane?
"Second. If such be the case, did he know right from wrong, as applied to the particular act in question? If he did not have such knowledge, he is not legally responsible.
"Third. If he did have such knowledge, he may nevertheless not be legally responsible if the two following conditions concur:
"(1) If, by reason of the duress of such mental disease, he had so far lost the power to choose between the right and wrong, and to avoid doing the act in question, as that his free agency was at the time destroyed;
"(2) And if, at the same time, the alleged crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it solely." Id. at 596, 2 So. at 866-867.
In 1954 the United States Court of Appeals, District of Columbia Circuit, had before it the case of Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430. In that case the appellant had been convicted of housebreaking. The *113 only defense offered was that the defendant was of unsound mind at the time of the crime. On appeal the defendant urged that (1) the burden of proof was upon the government to show sanity and (2) the existing tests of criminal responsibility used on the trial are obsolete and should be revised. The trial court rejected the defense of insanity because he did not show that "he didn't know the difference between right and wrong or that even if he did, he was subject to an irresistible impulse by reason of the derangement of mind." The appellate court reversed the judgment of the lower court and said:
"The rule we now hold must be applied on the retrial of this case and in future cases is not unlike that followed by the New Hampshire court since 1870. It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect. [citing State v. Jones, 50 N.H. 369, 398 (1871)]"
The Durham case was criticized at length by Judge Burger of that court in Blocker v. United States, supra. In his concurring opinion he said: "As I see it, our Durham opinion was a wrong step, but in the right direction * * *." He further said: "For 85 years every court which considered the New Hampshire test rejected it. Every court which considered Durham has rejected it." Many cases are cited on page 866 of Judge Burger's concurring opinion. This opinion also points out that Judge L. Hand, after having read the Durham case, said: "The truth appears to me to be that the question goes to the heart of whatever we choose to make our purpose in criminal punishment. It is only indirectly, or at second hand, a psychiatric question."
In 1966 the United States District Court of Appeals, Second Circuit had before it the case of United States v. Freeman, 2 Cir., 357 F.2d 606. The defendant had been convicted for selling narcotics. The real issue in the trial court was what test should be used to determine criminal responsibility. The trial jury used the M'Naghten rule supplemented by the "`irresistible impulse rule." On appeal, after a lengthy, scholarly discussion of all of the legal insanity tests from M'Naghten to and including Durham, the opinion concluded by reversing the conviction of the defendant and remanding "the case for a new trial in which the criteria employed will be those provided by Section 4.01 of the Model Penal Code" proposed by the American Law Institute. Id. at 625.
Judge Waterman concurred with the majority opinion "for the time being," because even though since the M'Naghten rule "[we] have changed our concepts of `mental disease', it is nevertheless also true that the scope of serious expert inquiry into the control of conduct has not halted, and tomorrow we may find that Section 4.01 need further judicial emendation in the light of tomorrow's further discoveries."
Section 4.01 of the American Law Institute's Model Penal Code (1962) explicitly rejects the Durham rule and supplies its own formula: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law."
This test proposed by the American Law Institute has been adopted in a number of states, beginning with Vermont in 1961, and including Illinois, New York, Wisconsin, and Maryland. It has been adopted also by such federal jurisdictions as the Tenth Circuit, and by the Second Circuit in the case of United States v. Freeman, supra. On the other hand, the Durham rule has been adopted only by Maine. More than forty states and most other jurisdictions retain the M'Naghten rule. The trend of opinions appears to be moving toward the American Law Institute test. Robitscher, Psychiatry and Changing Concepts of Criminal Responsibility, 31 Fed.Probation Q. 45 (Sept. 1967).
*114 In the meantime, new problems have erupted on the troubled waters of legal tests for mental responsibility, which may bring to focus a new concept in this field. In 1962 in Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, the United States Supreme Court applied the eighth amendment of the United States Constitution (against infliction of cruel and unusual punishment) to a case where a narcotic addict was put in jail for violation of the law making it illegal to be addicted to narcotics. The Court pointed out that the defendant was a sick man and made an analogy between the states of addiction and other conditions, such as mental disease, leprosy and venereal disease. The court pointed out that the punishment of a person for being sick violated the United States Constitution. This case raises questions concerning responsibility for criminal acts committed as a direct result of such illnesses.
Another class of cases which has appeared on the horizon is based upon the implication of mental illness in civil wrong. For example, in McGuire v. Almy, 297 Mass. 323, 8 N.E.2d 760 (1937), a nurse was assaulted by a mental patient. The question then arises what test, if any, will exculpate such a wrong. See the article entitled "Mental Illness as an Excuse for Civil Wrongs" by George J. Alexander and Thomas S. Szasz in 43 Notre Dame Lawyer 24 (Oct. 1967).
In discussing criminal responsibility and proposed revisions of the M'Naghten rule, the authors point out in Note, 32 St. John's Law Review 247 at 262 (1957-58) that:
"The paucity of legal support of the Durham rule and the testimony taken in the United States and England by the Royal Commission evidence preference for retention of the M'Naghten rule. This accords with the law's general conservative approach. Additionally, the courts retain doubts as to the approach of the field of psychiatry. Not only is divergence noted within the field itself, but the philosophic attitude of some of its spokesmen is, in its determinism and positivism, repugnant to a legal tradition imbued with Christian concepts of free will and individual responsibility."
It is said in Sauer v. United States, 241 F.2d 640, 649 (9th Cir.1957) that:
"The right and wrong test has withstood the onslaught of critics, not because it is scientifically perfect, but because the courts regard it as the best criteria [sic] yet articulated for ascertaining criminal responsibility which comports with the moral feelings of the community."
Justice Joseph Weintraub, Chief Justice of the Supreme Court of New Jersey, in a fine article in 49 American Bar Association Journal 1075 (1963) criticizing section 4.01 of the American Law Institute's Model Penal Code, said:
"I doubt that we need a distinction between the bad and the sick to the end that there be a social climate conducive to proper behavior. The climate would be as favorable if the potential offender knew the end of the road could be hospitalization rather than imprisonment, for both deny liberty. But if climate (rather than justice to the individual offender) is the touchstone for a test of criminal responsibility, M'Naghten is far in the lead. It provides much more of that climate than does the Model Penal Code or Durham. At any rate, if there is any scientific evidence which bears upon what test will best furnish the climate the public needs, let us have it and see how it stacks up."
Dr. Winfred Overholser's article appearing in 48 American Bar Association Journal 527 (1962), points up the difference between the law's moral concept of right and wrong and the psychiatrist's viewpoint of mental responsibility. The psychiatrist is not interested in the ethical understanding or mores except insofar as they lead to the discovery of the patient's physical norm. *115 See also Parsons v. State, 160 Tex.Cr.R. 387, 271 S.W.2d 643 (1953).
The writer of this opinion is personally inclined to favor the modern trend and feels that some additional criteria should be added to the M'Naghten rule. However, until the troubled waters of legal tests for insanity have become more calm and until the courts have charted some safe course and have settled upon some acceptable solution for a better test, this Court has decided to continue, "for the time being," to submit the question of criminal responsibility on the issue of insanity to the jury by the time-tested M'Naghten rule. The time-tested way is the safe way, and the safe way is the best way. Kearney v. State, 68 Miss. 233, 8 So. 292 (1890); Thomas v. State, 71 Miss. 345, 15 So. 237 (1893); Eatman v. State, 169 Miss. 295, 153 So. 381 (1934); Cunningham v. State, 56 Miss. 269 (1879); Grissom v. State, 62 Miss. 167 (1884); Bishop v. State, 96 Miss. 846, 52 So. 21 (1910); Hoye v. State, 169 Miss. 111, 152 So. 644 (1934); McGann v. State, 175 Miss. 320, 167 So. 53 (1936); Brummett v. State, 181 So. 323 (Miss. 1938); Johnson v. State, 223 Miss. 56, 76 So.2d 841, 81 So.2d 558 (1955).

II.
It is next contended that the trial court erred in admitting the alleged confession of the defendant "based on the recent guideline established by the U.S. Supreme Court in the case of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 * * *" It is also contended that, "Throughout the testimony it was established that the Defendant had the intelligence and mind of a 4 to 11 year old child. Using the case of Miranda, can we say that the Defendant knowingly waived his right to remain silent?" In other words, the question raised here is: Was the confession and waiver of constitutional rights understandingly and voluntarily given?
In Miranda the court said:
"Prior to any questioning [of a prisoner], the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. 436, 444, 86 S.Ct. 1612.
The court then said:
"Again we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, `Since Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.'" Id. at 448, 86 S.Ct. at 1614.
The appellant does not suggest a test by which the courts may determine whether or not one is mentally capable of making a voluntary confession or waiving his constitutional rights.
In examining the authorities on this issue we begin with the rule that the burden of proof is upon the prosecution to establish beyond a reasonable doubt that a confession of crime was made voluntarily. Simmons v. State, 61 Miss. 243 (1883); Hamilton v. State, 77 Miss. 675, 27 So. 606 (1900); Fletcher v. State, 159 Miss. 41, 131 So. 251 (1930); Randolph v. State, 152 Miss. 48, 118 So. 354 (1928); Hathorn v. State, 138 Miss. 11, 102 So. 771 (1925); Ellis v. State, 65 Miss. 44, 3 So. 188 (1887); Williams v. State, 72 Miss. 117, 16 So. 296 (1894); Lee v. State, 137 Miss. 329, 102 So. 296 (1924); Fischer v. State, 145 Miss. 116, 110 So. 361 (1926); Brittenum v. State, 175 Miss. 453, 167 So. 619 (1936); Bartee v. State, 180 Miss. 141, 177 So. 355 *116 (1937); Agee v. State, 185 So.2d 671 (Miss. 1966).
The general rule is, of course, that the confession of an insane person cannot be admitted in evidence because he cannot waive his constitutional rights against self-incrimination. Further, he cannot waive any right because he does not know of his rights. People v. Lambersky, 410 Ill. 451, 102 N.E.2d 326 (1951); State v. Padilla, 66 N.M. 289, 347 P.2d 312, 78 A.L.R.2d 908 (1959). Ordinarily a confession will not be excluded merely because the person making the confession is mentally weak. 23 C.J.S. Criminal Law § 828 (1961); Annot., 69 A.L.R.2d 348 § 2 (1960). However, it has been pointed out by the various courts that manifestly the will of a person who is of weak intellect or mentally deficient may be more easily overcome than that of one who is more intelligent; still, until it is shown that a weakminded person has been overreached to the end that he has divulged that which he would not have divulged had he not been overreached, his voluntary confession is admissible. 20 Am.Jur. Evidence § 522 (1939).
The United States Supreme Court said in Lynumn v. State of Illinois, 372 U.S. 528, at page 534, 83 S.Ct. 917, at page 920, 9 L.Ed.2d 922 (1963):
"We have said that the question in each case is whether the defendant's will was overborne at the time he confessed. Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716; Watts v. State of Indiana, 338 U.S. 49, 52, 53, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801; Leyra v. Denno, 347 U.S. 556, 558, 74 S.Ct. 716, 717, 98 L.Ed. 948. If so, the confession cannot be deemed `the product of irrational intellect and a free will.' Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242. See also Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; and see particularly, Harris v. State of South Carolina, 338 U.S. 68, 70, 69 S.Ct. 1354, 1355, 93 L.Ed. 1815."
The Supreme Court of the United States has been zealous to carefully scrutinize confessions made by young people, particularly where the evidence shows that they are of subnormal mentality. In Haley v. State of Ohio, 332 U.S. 596 at 599, 68 S.Ct. 302 at 303, 92 L.Ed. 224 (1948), the Court said:
"What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child  an easy victim of the law  is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is a period of great instability which the crisis of adolescence produces. A 15-year old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition."
In Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961), the defendant was a nineteen-year-old, mentally retarded youth classified as a "high grade mental defective." The court reversed the conviction of the defendant for the reason that the confession was coerced. See also Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) [the defendant was an "uneducated Negro, certainly of low mentality, if not mentally ill"]; cf. Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).
This Court has always made a careful scrutiny of confessions by "dull, sub-normal youths." In Hamilton v. State, 77 Miss. 675, 27 So. 606 (1900), this Court examined a confession of a "dull Negro boy" and concluded that he was easily influenced by anyone, and the Court said, "we are unable to pronounce that this confession *117 was free and voluntary, beyond a reasonable doubt * * *." Id. at 608.
In Ford v. State, 75 Miss. 101, 21 So. 524 (1897), this Court considered a confession of a dull Negro boy, thirteen years old, who confessed at the suggestion of the marshal. One of the witnesses who knew the boy was asked, "What is the nature of his mind as to brightness?" He replied, "He is just this way: If you ask and want him, he is going to give you the answer you desire. If you want a `yes' he will give it to you, and if you want a `no' he will give you that." After pointing out that an officer must not tell a defendant that it would be best for him to confess, the Court said: "It is manifest that the confessions obtained by the marshal while the boy was in his custody were inadmissible."
In the instant case the expert testimony shows that the defendant functioned at a level of an eight to twelve-year-old boy, but that when he became upset his ability to function decreased. The psychologist testified, "I would say he is like a child to the extent that a child of the level of his mental ability would be likely to be led." One of the officers who heard the confessions said, "He was more than willing to give us the statement for at the time he appeared like he didn't think there was nothing to it." Applying the law to the facts in this case, we have reached the conclusion that the alleged confession of the defendant should not have been admitted into evidence before the jury. The evidence did not show the confession to be voluntary beyond a reasonable doubt, and we are not prepared to say that a mentally deficient person of the caliber shown here can waive his constitutional rights.
It is true that the defendant did not offer proof of his incapacity at the time the prosecution offered the confession in evidence in the absence of the jury, as he should have done under the proper procedural rule in this state. See Agee v. State, 185 So.2d 671 (Miss. 1966). However, the defendant did object to the introduction of the confession and was refused a requested instruction made to the court to instruct the jury to disregard the statement made by the defendant to the officer.
In Fisher v. State, 145 Miss. 116, 110 So. 361 (1926), this Court quoted from the syllabus in Johnson v. State, 107 Miss. 196, 65 So. 218, 51 L.R.A.,N.S., 1183 (1914), as follows:
"If on preliminary hearing by the court, there is a reasonable doubt as to whether a confession was freely and voluntarily made, it must be excluded from the jury, and after a confession has, upon preliminary hearing by the court, been admitted to go to the jury, either party may introduce the same evidence as was submitted to the court, and any additional evidence relative to its weight or credibility, and if it then, or at any stage of the trial, appears that the confession was made under circumstances rendering it incompetent it should be excluded." Id. at 131, 110 So. at 364.
We are of the opinion in the instant case that the objection to the confession should have been sustained when it became apparent that the defendant was not mentally capable of understanding the gravity of the charge against him or of understanding the meaning of a waiver of his constitutional rights. Cf. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

III.
This case must be reversed for a new trial, and in order to prevent further errors on retrial we point out two additional errors which should be avoided on a second trial.
First, the State and the defendant introduced lay witnesses who gave their opinions as to the sanity of the defendant without first stating the basis on which such opinions rested. Although no *118 exact rule can be laid down as regards the amount of knowledge a witness must possess, nonexpert witnesses will not be permitted to express a general opinion as to sanity; nor can they give an opinion independent of the facts and circumstances within their own knowledge. They may detail relevant facts known to them, and thereupon express an opinion as to the sanity of the person whose mental condition is being investigated. The value of such testimony will depend largely on the opportunities of the witnesses for correct observation of the appearance and conduct of the person whose mind is claimed to be unsound, as well as the character of such appearance and conduct. In short, an opinion of a nonexpert witness must be accompanied by statements of the specific facts on which it is based. Keeler v. State, 226 Miss. 199, 84 So.2d 153 (1955); McGarrh v. State, 249 Miss. 247, 148 So.2d 494 (1963); Williams v. State, 185 Miss. 449, 188 So. 316 (1939); McGinnis v. State, 201 Miss. 239, 29 So.2d 109 (1947); Bishop v. State, 96 Miss. 846, 52 So. 21 (1910); Bacot v. State, 96 Miss. 125, 50 So. 500 (1909); Reed v. State, 62 Miss. 405 (1884); 23 C.J.S. Criminal Law § 867(b) (1961); 20 Am.Jur. Evidence § 853 (1939); Annot., 72 A.L.R. 579 (1931).
Second, after the defendant had concluded his defense and had rested his case, the State introduced a psychiatrist and propounded to him a long, hypothetical question asking him to assume as true, given facts, which embodied practically all the testimony introduced before the jury, including the opinion of other expert witnesses. The doctor was then asked whether or not the defendant knew the difference between right and wrong at the time of the alleged crime. This question was erroneous for two reasons. The first is that the question included practically all of the evidence introduced and permitted the doctor to usurp the functions of the jury and to decide the jury issue. Prewitt v. State, 106 Miss. 82, 63 So. 330, 6 A.L.R. 1476 (1913); Underhill, Criminal Evidence § 312 (4th ed. 1935); 23 C.J.S. Criminal Law § 884 (1961).
A hypothetical question, however, must include all the undisputed facts related to the subject within the field in which the expert is able to aid the jury with an expert opinion. Rush v. State, 254 Miss. 641, 182 So.2d 214 (1966); Birchett v. Hundermark, 145 Miss. 683, 110 So. 237 (1926). Nevertheless, all facts should be excluded which the jury can interpret as well as the expert. Rogers, Expert Testimony § 185 (3d ed. 1941).
Next, an expert witness cannot express his opinion based upon the opinion and testimony of other experts. 23 C.J.S. Criminal Law § 884 (1961); Parrish v. State, 139 Ala. 16, 36 So. 1012 (1904).
We hold, therefore, that since no new formula has been tried and found acceptable, this Court will continue to adhere to the M'Naghten rule as a test of criminal responsibility by reason of insanity. We hold that the confession of the defendant in the instant case was erroneously permitted to be considered by the jury, and for that reason this case must be reversed and remanded for a new trial without the use of the confession.
Reversed and remanded.
ETHRIDGE, C.J., and BRADY, PATTERSON and SMITH, JJ., concur.