**STATE of Iowa, Appellee,**

v.

**Earl E. HARKNESS, Appellant.**

**No. 52506.**

Supreme Court of Iowa.

July 18, 1968.

———◆———

Harlan W. Bainter and Thomas F. Bell, Mt. Pleasant, for appellant.

Richard C. Turner, Atty. Gen., David A. Elderkin, Asst. Atty. Gen., and James L. Morrison, County Atty., Mt. Pleasant, for appellee.

MASON, Justice.

This is an appeal from judgment following a jury verdict convicting defendant Earl E. Harkness of second degree murder contrary to section 690.3, Code, 1966.

May 13, 1966, a Henry County grand jury returned an indictment charging defendant with the crime of murder. At arraignment upon defendant's showing he was indigent and unable to afford the services of counsel his present attorneys were appointed by the court to represent him. A plea of not guilty was later entered and on application of his attorneys an order was entered transferring defendant temporarily from the Henry County jail to the psychopathic hospital in Iowa City for purposes of undergoing a private·psychiatric examination. He remained at the hospital as a private patient for a period of four weeks. September 2 he entered an additional plea of not guilty by reason of insanity.

At the conclusion of all evidence defendant requested two instructions, one incorporated the Durham rule and the other the American Law Institute rule as tests of his insanity. Both were refused and instruction 21 embodying the M'Naghten rule was given by the trial court.

I. Defendant's appeal challenges the adequacy of the current test being used in this state as a guide by which the jury may determine the criminal responsibility of persons charged with crime. He contends M'Naghten's rule as the test for this responsibility should be replaced by either the American Law Institute rule or the Durham rule or both. This contention presents the only question on this appeal.

II. The jury found, and there is no evidence upon the record submitted upon this appeal to dispute the fact, defendant shot and killed Dale Edgington April 18, 1966. He was sentenced to 40 years in the penitentiary at Fort Madison.

Defendant lived in a one-room cabin upon farm ground owned by one Arthur Stevenson. He was not employed by Stevenson, but was simply permitted to live there, from time to time picking up sticks and generally looking after the place. (There were a farm house and other buildings in the vicinity of defendant's cabin.)

Stevenson had hired Dale Edgington (deceased) to do some bulldozing and this involved clearing the land, part of which was proximal to defendant's cabin. De-

fendent complained to Stevenson that Edgington was running the bulldozer too close to his building, destroying the yard.

Doctor Truax, the psychiatrist who later examined defendant, testified defendant told him he had argued with Edgington about driving the bulldozer too close to the cabin, and asked him to keep it away. Further, Edgington had driven so close he broke the front sidewalk and almost pushed the cabin over.

Sunday, one week prior to April 18, deceased and some of his relatives were out looking over the farm and observed someone peering out a window in the farm house. Deceased explained it was probably "the old squatter who lived in the cabin." They proceeded to the farm house, walked in and were confronted by defendant who ordered them from the house.

Monday morning Edgington returned, attempted to start his bulldozer but apparently decided not to because it was too wet and then left.

Defendant grabbed one of his many rifles and walked to the creek to see how much it had rained. While there, he observed Edgington driving toward him rapidly in a pickup truck. Edgington stopped and apparently began kidding defendant about how much it had rained. Defendant felt that he was being ridiculed and told Edgington to move away. When Edgington did not, defendant "became very angry."

Defendant told Dr. Truax he remembered picking up his rifle, lifting it into a firing position, but did not remember moving the safety or pulling the trigger. The next thing he remembered was being in his cabin "with the vague feeling that he had killed something." He claimed a partial amnesia for the period of the shooting itself.

Defendant then drove to Mount Pleasant to the sheriff's office. Finding sheriff and deputy gone, he told the sheriff's wife he thought he was the man the sheriff was looking for, that he had just shot a man.

Defendant had requested the trial court to instruct that if the jury find by a preponderance of the evidence:

" * * * [1] that his act was the product of mental disease or unsoundness, then he is not amenable to legal punishment and your verdict should be not guilty by reason of insanity (the Durham rule).

" * * * [2] that at the time of the killing he was suffering from a mental disease or unsoundness and that because of said mental disease or unsoundness, he lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, then he is not amenable to legal punishment and your verdict should be not guilty by reason of insanity [the ALI rule]."

III. The defense relies almost wholly upon the testimony of Dr. Richard Allen Truax, a medical doctor who is presently a resident in psychiatry at the psychopathic hospital at the University of Iowa. Dr. Truax first met defendant June 8, 1966, when he was admitted to psychopathic hospital in Iowa City for purposes of evaluation.

The psychiatric evaluation is based upon the following. Data is compiled to construct a life history; then the patient is given a mental status evaluation to evaluate his intellectual function to see if there is any gross evidence of mental illness. He is observed in a series of interviews as to his emotional responses to the examiner and is given a physical examination. An electroencephalogram (a tracing or linear record of the electric currents generated by the brain) is given as well as a brain scan. Psychological and neurological tests are run. Dr. Truax personally had eight conversations with the patient over a period of approximately five weeks, each lasted 30 to 90 minutes. Finally, the patient is observed during his stay at the hospital to see what sort of person he is on the ward, partially stemming from his conversation and interrelationship with other people on the ward.

Basically, the life history is as follows. Early in life defendant engaged in farming, the junk business and later worked as a night watchman, as well as a part-time construction worker. He had a tendency to avoid people and lived by himself. His sister and brother more or less left him alone while he was working on the home farm. He preferred to work as a night watchman where he was alone, not around other people who disturbed him. After his mother died, he spent all of his free time in a shack out in the country away from people, avoiding people, seeming to question their motives and not wanting to get involved with them. Dr. Truax stated, "This aspect was part of an overall pattern permeating his life history. He learned to leave his brother alone as in doing so things would go pretty much okay. However, one time he did assault his brother with a hammer, and took an ax after a neighbor."

Defendant's brother Ival testified about the defendant's attempt to assault him with a hammer until his mother intervened and called the sheriff. Also, "as to Earl's disposition and temper, he don't bother nobody as long as nobody bothers him. When somebody bothers him, he gets pretty mad. I wouldn't know what all he would do when he gets mad."

"Q. Based upon your observation of Earl during the time he lived in that community and your overall experience with him during your early life and early and middle life particularly observing him when he was under stress, would you have an opinion as to his mental condition? A. Yes.

"Q. What is your opinion, Mr. Harkness? A. Well, he would get violently mad. I would say there was some mental disorder there when he gets so mad."

Defendant was found to be in good physical health. His neurological examination revealed some early organic brain damage.

Observations of defendant's behavior at the hospital revealed the following. "He remained aloof from other people. He seemed to be suspicious of them. * * * Basically, he would tend to withdraw from activities. He would be friendly on approach, but he would withdraw from people as soon as he could. He stayed by himself."

Dr. Truax related the following from conversation had with defendant during interviews. "When he first arrived, I questioned him concerning the murder, and as he would relate the details of his encounter with the deceased, he became very angry, his face was flushed, his blood pressure went up. * * *. Mr. Harkness felt the deceased was ridiculing him and told him to move away. He didn't. Mr. Harkness said he became very angry. He does not remember exactly what the argument was about. * * * He has been consistent in his history as he has given it to me over quite a few hours of talking. This consistency, of course, is an indication that he is telling the truth."

Dr. Truax then stated the conclusions from the psychiatric evaluation and correlated them with facts already divulged in the life history. While Dr. Truax is himself not a board psychiatrist, he was at all times concerned during the evaluation under the supervision of Dr. Noyes, a board psychiatrist, and in conference with Dr. Paul Huston, director of the hospital. Also Dr. Truax testified his views represent substantially those of the medical staff at the hospital.

"Our medical findings and conclusions concerning Mr. Harkness were that we were dealing with an eccentric, suspicious, reclusive individual who easily felt other people were out to annoy him and that he would have to defend himself from them. * * *

"Our diagnosis of Mr. Harkness' condition is that he has a paranoid personality. Individuals who suffer from a paranoid personality have many of the traits of a schizoid personality coupled with an exquisite sensitivity in inter-personal relations, and with a conspicuous tendency to

utilize a projection mechanism expressed by suspiciousness, envy, extreme jealousy and stubbornness. * * * When we speak of projection, this is a method where a person attributes his own thoughts and actions to sources outside of himself. For example, a man may be extremely angry, but he does not think in terms of the 'I' am angry. He thinks 'other people are angry at me, those people out there are angry at me.' This is not something that an individual can control himself, not to any significant degree. In this case, Mr. Harkness' condition is not treatable to any significant degree. If he were to be placed in a similar situation again most likely the same thing would happen again. There is no medical treatment that will cure this paranoid personality that Mr. Harkness has.

"* * * * * *

"We cannot say for certain whether or not Mr. Harkness was in the mental state that he was aware of the nature and consequences of his act or not.

"He has a suspicious personality. When stressed by somebody or something that would be a minor stress to somebody else, he could easily imagine that things were happening that were not happening, and then not be able to remember this episode, but we have no proof that this happened. You see, Mr. Harkness is a man that is not totally sane or totally insane. If he is stressed enough he loses control of his thought processes. * * *

"Q. Now, Dr. Truax, based on a reasonable medical certainty and concerning the mental illness or defect which you described Mr. Harkness as having did he lack substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law on April 16, 1966, at the time of the alleged crime? A. On this question I cannot honestly say if he had substantial capacity or not. * * I could venture an opinion, but it would be an opinion only and it would not be an opinion that would be firm enough so that I think I should give it.

"* * * * * *"

Cross-examination brought the following testimony.

"Q. Do you have any proof that Earl Harkness has not been malingering, proof, you may have an opinion or belief, but proof? A. I have proof to the reasonable medical certainty of 85–90%.

"Toward law and order, basically Mr. Harkness seems to be a man who believes in law and order and tries to comply with it, and it has been because he is so stressed by being around other people that he gets away from people. He cannot handle his hostility. He can't handle closeness with them. He gets away from them rather than get in trouble. In this case he felt surrounded apparently by this man. He was in around the shack, but the man was also around there, and it was just too much for him.

"* * * * * *

"We suspect defendant has cerebral arteriosclerosis with reasonable medical certainty based upon the findings of the psychological test in the fact that his blood pressure would rise to such tremendous levels with only a little bit of stress being placed upon him. Now, just what the results of this impediment to the flow of blood to his brain are we really can't say. Certainly there are other people that have cerebral vascular disease that don't commit murder. I do not wish to make that connection here. * * *

"* * * * * *

"Q. Doctor, do you know what the defendant's attitude is toward shooting another human being? A. He regards killing another human being as wrong. However, although he will say this, his emotions are confused to the point where he doesn't feel toward another human being like the rest of us feel. He was able at times for instance to laugh about the situation he was in and about what he had done. His way of feeling toward other people is distorted, but yet he knows that in a legal sense it is wrong to murder somebody. He

knows now as he looks back on it he shouldn't have done it.

"      *      *      *      *      *      *

"It is possible for a person to be legally sane at the instance of a shooting and then immediately thereafter by reason of the traumatic experience of having participated in such an event to become psychotic. * * *, but a paranoid personality itself is something that is more crystalized and something that is more developed. This is something that starts out in formative years of life, and it is possible that a person after commission of a crime may develop an acute psychotic episode but a person would not develop a crystalized disorder like a paranoid personality after the commission of a crime.

"* * *, now again this history that he gives of his past life is far too complex a thing, a person can't fake a paranoid personality over a period of years. This is just too big a thing to fake. I don't think I could do it or a psychiatrist would have a hard time doing it if such a thing could be faked. * * *

"      *      *      *      *      *      *

"Q. Would you say the defendant is possessed of anti-social impulses? A. Well, Mr. Harkness has aggressive impulses that he has difficulty controlling. This isn't a voluntary thing that he wants to do, anti-social things as far as we can determine. He does not fall under the category of a sociopathic personality, but he has these urges and impulses within which he has a hard time controlling, and at times he can disrupt into anti-social acts if he is stressed to a sufficient degree.

"Q. By the same token you are also saying that he has and does intend control of these impulses at least to a point? A. To a point. It depends on how much he is stressed. Certainly not anywhere near the point where most of us can.

"      *      *      *      *      *      *

"Q. Doctor, would the defendant have committed an act if a policeman were look-

ing on? A. I suspect he would have. Again this is a speculative question, but I suspect he would have.

"Q. Do you feel that if he is released he might kill again? A. Yes. If he was given weapons and allowed to be in a situation where somebody could aggravate him, it certainly could happen again.

"      *      *      *      *      *      *

"Q. Would you agree that paranoid thinking in degrees is very common in our society today? A. Not to the extent that it it is seen in Mr. Harkness. It isn't really very common. Paranoid thinking isn't really paranoid unless it is considerably out of the range of normal. * * *

"      *      *      *      *      *      *

"Q. Do you have an opinion as to whether or not there are a great many people walking around in the world today with paranoid personalities? A. Well, percentage wise there aren't a great number. There are a certain number of eccentric people who live by themselves and get along fine until somebody aggravates them and then something happens. If Mr. Harkness hadn't been aggravated, you don't know. He might have gotten along all his life without doing this. If somebody aggravated him, it would happen again.

"      *      *      *      *      *      *

"Q. Doctor, would you agree that every human being has a breaking point? A. Well, I would say every human being has a breaking point perhaps that would be absolute under sufficiently adverse circumstances, but not to the degree that every person has a breaking point in everyday life. * * * Given enough stress most people will break. Most normal people would not break under the stress that Mr. Harkness breaks under."

Dr. Truax was then asked why the defendant turned himself in to the sheriff after he had shot Dale Edgington.

"A. Well, I presume again here you are asking me for a judgmental answer. I presume he shot the man—at the time

when he had little emotional control, perhaps wasn't quite aware of what he was doing. After he stopped for a minute he looked back and could see this is a mistake. This is something that is against the law perhaps more than that if I run away people will be after me, so he decided to do the thing most people would do if they find out they have made a tragic mistake of this type."

IV. Merit of defendant's defense of lack of criminal responsibility must be determined by Dr. Truax's testimony. Translating psychiatric evaluations and impressions into lay facts, he established to a reasonable medical certainty within the range of 80–90 percent accuracy that defendant was suffering from a developed, persistent and acute mental disturbance. This testimony, not disputed by psychiatric testimony to the contrary and consistent throughout, enabled the jury to apply the facts to the instructions on the standards or tests of legal insanity.

Instruction 21 stated in part:

"Insanity, as the word is used in these instructions, means a diseased or deranged condition of the mind which renders a person incapable of knowing or understanding the nature and quality of his act, or unable to distinguish right and wrong in relation to that act.

"The test of insanity is this: First, did the defendant have such mental capacity to know and understand what he was doing, and second; did he know and understand that it was wrong and a violation of the rights of another? To be sane and thus responsible to the law for the act committed, the defendant must be able both to know and understand the nature and quality of his act and to distinguish between right and wrong at the time of the commission of the offense." As stated, this is in substance the M'Naghten rule.

"It might be useful to digress for a moment to point out that there is a very common and widespread error about the M'Naghten Rule which even some of the

very sophisticated writers (including some judges) refer to as the 'right and wrong test.' History shows that the M'Naghten test in 1843 replaced and supplanted the ancient 'right and wrong' test. Prior to 1843 in England, a man was held responsible if at the time of his criminal acts he was able to distinguish the difference between right and wrong. This was a test which grew from the ancient ecclesiastical courts, but the M'Naghten test did away with this abstract approach and substituted a new and concrete standard largely influenced by the writings of Dr. Isaac Ray. This test was whether the defendant knew that *the particular act* he was committing was wrong." Warren E. Burger, Judge United States Court of Appeals, Washington D. C., Psychiatrists, Lawyers, and the Courts, Federal Probation, June 1964.

Precisely the test which finally emerged as the M'Naghten rule is this:

"* * * to establish a defense on the ground on insanity it must be clearly proved that at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong. M'Naghten's case, 10 Cl. and F. 200, 210, 8 Eng.Rep. 718, 722, 1843." Psychiatrists, Lawyers, and the Courts, supra.

It is fair to assume the jury placed great emphasis upon Dr. Truax's testimony that defendant knew generally the difference between right and wrong and regarded killing another human being as wrong in the legal sense. Although defendant claimed partial amnesia at the time of the shooting, when he realized shortly thereafter he had killed something he turned himself in to the sheriff's office, and now looking back on the incident realizes what he did was wrong. This, coupled with the doctor's inability to say with any degree of certainty that at the time of the shooting defendant did not know what he was doing or that what he was doing was wrong, certainly

enabled if not compelled this jury, under the instructions given, to find defendant at the moment of the shooting knew what he was doing, that it was wrong, was sane and guilty.

Apparently all relevant expert testimony on defendant's mental condition was received. At least defendant makes no claim the jury was deprived of information vital to their final verdict by any adverse ruling of the court. He was content Dr. Truax's testimony had developed for the judge and jury most of the necessary fact material for an adequate decision.

To put his contention differently, defendant's complaint is directed to the limited application the jury was permitted to make of this evidence in arriving at their verdict under the court's instructions; they should have been permitted to consider it under an instruction comprising either the Durham or American Law Institute definition.

"In criminal law 'insanity', by whatever test it may be ascertained, may be said to be that *degree or quantity* of mental disorder which relieves one of the criminal responsibility for his actions." Sollars v. State, 73 Nev. 248, 316 P.2d 917, 919.

Whether this defense of mental irresponsibility should prevail in a given case, of course, is determined in a large degree by the standard the court provides the jury with which "to measure whether the degree of relationship between the mental illness of the accused and his offensive conduct is sufficient to relieve him from responsibility. We refer to this standard as the definition of the defense of insanity. It is not a definition of mental illness or medical insanity, but a definition of the defense, a legal and not a medical concept.

"There are three types of competing definitions: (1) M'Naghten, or right-wrong, stated in terms of loss of capacity to know the nature and quality of one's acts or to know right from wrong, or distinguish between them. It is immaterial whether there has also been loss of power to control

one's conduct. It is assumed that one does not really lose power of self control unless one has also lost power to know the nature and quality of one's acts or to distinguish between right and wrong. (2) Definitions under which inability to know the nature and quality of one's acts or to distinguish between right and wrong constitutes a defense, but loss of power of self control even if standing alone is also a defense. The so-called irresistible impulse modification of M'Naghten falls in this class, as does also the proposed American Law Institute definition. The latter requires an impairment of one capacity or the other, but not total loss of either. (3) The Durham or New Hampshire definition. 'An accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect.' This definition comes close to leaving the ultimate question to the jury and, in a sense, is not a standard." State v. Esser, 16 Wis.2d 567, 586–587, 115 N.W.2d 505, 515–516.

That we are committed to the M'Naghten rule at least since State v. Buck (April 3, 1928), 205 Iowa 1028, 1039, 219 N.W. 17, 21, is conceded. The question we consider is whether this rule should continue to remain the standard by which criminal responsibility is determined in this state. We are seeking a proper criterion for testing criminal responsibility and insofar as possible one with a fair balance between competing considerations as the best course for (a) the protection of society, (b) the protection of defendant and (c) the rehabilitation and restoration of defendant. Certainty is scarcely possible in this troublesome area.

" * * * Determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. * * * It is the psychiatrist who informs as to the mental state of the accused—his characteristics, his potentialities, his capabilities. But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held ac-

countable for his acts." United States v. Freeman (2 Cir.), 357 F.2d 606, 619–620.

V. Defendant asked the trial court to instruct on the basis of the Durham rule. As stated in Durham v. United States (1954), 94 U.S.App.D.C. 228, 214 F.2d 862, 874–875, 45 A.L.R.2d 1430:

"The rule we now hold must be applied on the retrial of this case and in future cases is not unlike that followed by the New Hampshire court since 1870. [State v. Pike, 49 N.H. 399, 402] It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."

"Since its adoption in 1954, the 'disease-product' test has been both acclaimed and criticized; it has been called 'vague,' 'confusing,' 'ambiguous,' 'misleading,' and it has been condemned as taking the fact determination away from jurors and transferring it to experts. Curiously it has even been attacked as 'novel' by critics who overlooked its 1869 origins, and as 'radical' by some who seemingly are unwilling to allow the same scope to medical testimony in a criminal case as we have allowed historically in civil cases, such as will contests where mental capacity is at issue." Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853, 857–858 (Burger, C. J., concurring in result only.).

For review of the history and demonstration of the defects of Durham see Judge Burger's opinion in Blocker, supra, 858–865 and State v. Lucas, 30 N.J. 37, 152 A.2d 50, 67–68, and authorities cited in these opinions.

In the six-year interval between its announcement and the Blocker opinion, the Durham rule had not been accepted by any other jurisdiction. It obtains only in the District of Columbia, in New Hampshire where it originated in 1870 and in Maine by statute. See Harvey v. State (February 19, 1968), Miss., 207 So.2d 108, 113. By March 1961 it had been presented to and urged upon many courts, considered and rejected by three courts of appeals, by the United States Court of Military Appeals, and by the highest court of 20 states. For a collection of these authorities see 288 F.2d footnote 22 at page 866 of Judge Burger's opinion and a similar collection in State v. Lucas, supra, 152 A.2d 67.

We reject the Durham rule not because of its lack of success in winning adherence but by reason of what we believe are serious deficiencies:

(1) The term "disease" is inadequate. The Durham rule "is based on the premise that the critical threshold issue is whether defendant has a 'mental disease or defect.' * * * [The] opinion did not define these terms except to say that the former is a 'condition which is considered capable of either improving or deteriorating' while the latter was fixed and subject neither to improvement nor deterioration. This merely distinguishes 'disease' from 'defect' without defining either term. Not being judicially defined, these terms mean in any given case whatever the expert witnesses say they mean, * * * Psychiatrists are in disagreement on what is a 'mental disease,' and even where there exists such a definable and classifiable condition. '* * * There are very few people who could not qualify under this test * * *.' Dr. C. Savage, Discussion, 116 Am.J. of Psychiatry 295, 296 (1959).

"(2) The term 'product' is inadequate. * * * [The Durham] opinion assumed, without discussion, that mental disease can 'produce' or cause criminal acts.

"*    *    *    *    *    *

"In ordinary usage the term 'product' has a reasonably well understood meaning in relation to everyday matters. But in Durham the word is not used in relation to ordinary matters or subjects familiar to laymen or indeed even to judges. There it is used rather in a quasi-medical sense of being the causal link between the 'disease' and the criminal act charged. So used it is a spurious term, neither wholly medical nor wholly legal but partaking of both. * * *

**332**

" *   *   *   *   *   *

"Apart from all other objections the product aspect of *Durham* is a fallacy in this: assuming arguendo that a criminal act can be the 'product' of a 'mental disease' that fact should not per se excuse the defendant; it. should exculpate only if the condition described as a 'mental disease' affected him so substantially that he could not appreciate the nature of the illegal act or could not control his conduct." Blocker v. United States, supra, 288 F.2d at 859–862.

(3) The scope of expert testimony permitted under this rule has a tendency to transfer the jury function to experts.

"The hazards in allowing experts to testify in precisely or even substantially the terms of the ultimate issue are apparent. This is a course which, once allowed, risks the danger that lay jurors, baffled by the intricacies of expert discourse and unintelligible technical jargon, may be tempted to abdicate independent analysis of the facts on which the opinion rests; this is also likely where the opinion giver is a skilled forensic performer." Blocker v. United States, supra, 288 F.2d at 863.

If the psychiatrists all agree that defendant has a "disease" and the act was its "product" the expert has literally told the jury how to decide the case. We question the soundness of a rule whose very terms encourage if not require the experts to state conclusions in the terms of the ultimate issue.

"The 'product test' is a *subjective* determination upon which is pivoted the question of moral responsibility, i. e. penalty, which the court or jury can and should resolve. It is not too much to ask the triers to make verdicts in their own terms; it is within the power of the courts to do so. *I would submit that if the product question is withheld from the expert and confined to the triers, psychiatry can function properly.* The jury can decide the matter under applicable law as instructed by the court,

since it is determining a moral (legal) issue *in its own terms.* In this insulation of the psychiatrists from the 'product' question we are keeping our symbols straight and pure." Roche, The Criminal Mind 266 (1958). Cited in Blocker v. United States, supra, 288 F.2d at 864, footnote 19. In this connection see M. Capp Manufacturing Company v. Hartman, 260 Iowa 24, 148 N.W.2d 465, 468.

In United States v. Freeman, supra, 357 F.2d at 621–622, Judge Kaufman states:

"The most significant criticism of *Durham*, however, is that it fails to give the fact-finder any standard by which to measure the competency of the accused. As a result, psychiatrists when testifying that a defendant suffered from a 'mental disease or defect' in effect usurped the jury's function. This problem was strikingly illustrated in 1957, when a staff conference at Washington's St. Elizabeth's Hospital reversed its previous determination and reclassified 'psychopathic personality' as a 'mental disease.' Because this single hospital provides most of the psychiatric witnesses in the District of Columbia courts, juries were abruptly informed that certain defendants who had previously been considered responsible were now to be acquitted. [Citing authority]. It seems clear that a test which permits all to stand or fall upon the labels or classifications employed by testifying psychiatrists hardly affords the court the opportunity to perform its function of rendering an independent legal and social judgment."

The court's refusal to instruct under *Durham* was not error.

VI. As stated, defendant also asked that the jury be instructed on the basis of the American Law Institute (ALI) definition. The American Law Institute, Model Penal Code, section 4.01, adopted in 1962 provides:

"(1) A person is not responsible for criminal conduct if at the time of such

conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

In 1961, the third circuit, in substance, agreed with the ALI definition, although it limited its express definition to the volitional element of ALI, that is, lack of substantial capacity to conform conduct to requirements of law. United States v. Currens (3 Cir. 1961), 290 F.2d 751. In 1963, the tenth circuit adopted ALI, but required additional instructions that in order to convict the jury must be convinced that defendant was mentally capable of knowing what he was doing, that it was wrong, and of controlling his conduct. Wion v. United States (10 Cir. 1963), 325 F.2d 420, cert. denied 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964). In 1966, the second circuit adopted the ALI definition, substituting "wrongfulness" for "criminality." United States v. Freeman (2 Cir. 1966), 357 F.2d 606, 622–625.

The eighth circuit has recently repeated its earlier expression that instructions following ALI or other forms would be satisfactory if they required positive findings on the various elements, including capacity to control. Pope v. United States (8 Cir. 1967), 372 F.2d 710, petition for certiorari pending; Dusky v. United States (8 Cir. 1961), 295 F.2d 743; and Feguer v. United States (8 Cir. 1962), 302 F.2d 214. In 1967, the seventh circuit reversed and remanded for new trial with instructions reflecting the ALI definition of the defense of insanity. United States v. Shapiro (7 Cir.), 383 F.2d 680. April 4, 1968, the fourth circuit approved the ALI insanity test. United States v. Chandler (4 Cir.), 393 F.2d 920. The Criminal Law Reporter, Vol. 3, No. 6, May 8, 1968.

In Pope v. United States, supra, 372 F.2d at 737, an appendix sets forth the respective approaches of the several federal courts of appeals to the issue of criminal responsibility, current as of February 13, 1967, at page 741 appears a collection of legal periodicals bearing on the various standards of responsibility and in 45 A.L.R.2d 1447 there appears an annotation, "Modern status of the M'Naghten 'right-and-wrong' test of criminal responsibility" listing the approaches to the problem in the various state courts.

"This is not one of those questions on which the legal researcher cannot find enough to quench his thirst. To the contrary there is so much authority it drowns him." Baker v. Starkey, 259 Iowa 480, 492, 144 N.W.2d 889, 896, quoting from Arthur Murray Dance Studios of Cleveland v. Witter, Ohio Com.Pl., 105 N.E.2d 685, 687.

In United States v. Shapiro, supra, 383 F.2d at 688, Judge Fairchild stated:

"The function of a definition of the defense of insanity, as reflected in the instructions, is to aid the jury in deciding whether an accused who is mentally ill was, at the time of engaging in the offensive conduct, dominated or affected by his mental illness to so substantial a degree that society cannot in good conscience, hold him responsible for the conduct as a crime."

This is not a situation where defendant's request for instructions involved an issue not tendered and concerning which there was no evidence. Dr. Truax's testimony set out, supra, furnishes ample basis for application of either the *Durham* or ALI definition.

Because of what we believe to be substantial deficiencies we have rejected the *Durham* rule, even with the limitations and changes made by McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 851 and Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444.

The remaining problem is a choice between competing considerations of M'Naghten and the ALI standard.

For a "necessarily abbreviated" historical account of M'Naghten see United States v. Freeman, supra, 357 F.2d at 618, Harvey v. State, supra, 207 So.2d at 112–113.

The essence of M'Naghten is a demand of proof of defect in cognition, that is, whether defendant had capacity to know the nature and quality of his acts and distinction between right and wrong. Bernard L. Diamond, M. D., From M'Naghten to Currens and Beyond, 50 Cal.L.Rev. 189. This traditional rule resolves the problem of defining the criterion of irresponsibility solely in regard to the capacity of the individual to know what he was doing and to know that it was wrong. Comment to ALI, Model Penal Code, section 4.01, page 156.

In United States v. Freeman, supra, 357 F.2d at 618, Judge Kaufman says:

"* * * [T]he principal objection to M'Naghten is not that it was arrived at by this extraordinary process. Rather, the rule is faulted because it has several serious deficiencies which stem in the main from its narrow scope. Because M'Naghten focuses only on the cognitive aspect of the personality, i. e., the ability to know right from wrong, we are told by eminent medical scholars that it does not permit the jury to identify those who can distinguish between good and evil but who cannot control their behavior. The result is that instead of being treated at appropriate mental institutions for a sufficiently long period to bring about a cure or sufficient improvement so that the accused may return with relative safety to himself and the community, he is ordinarily sentenced to a prison term as if criminally responsible and then released as a potential recidivist with society at his mercy. To the extent that these individuals continue to be released from prison because of the narrow scope of M'Naghten, that test poses a serious danger to society's welfare.

"* * * M'Naghten's single track emphasis of the cognitive aspect of the personality recognizes no degrees of incapacity. Either a defendant knows right from wrong or he does not and that is the only choice the jury is given."

M'Naghten's rule is said to be defective in failing to give expressed recognition to volitional disorders, disorders, that is, that deprive the person of control over his behavior. Francis A. Allen, Professor of Law, University of Chicago, The Rule of the American Law Institute's Model Penal Code, 45–46 Marq.L.Rev. 494, 498.

In addressing itself to impairment of the cognitive capacity, M'Naghten demands that impairment be complete: the actor must not know. So, too, the irresistible impulse criterion presupposes a complete impairment of capacity for control. Comment to ALI, Model Penal Code, supra, page 158.

"* * * What is wrong with the M'Naghten rule lies not in its approach to the problem of legal insanity, but rather in that it demands too much. It calls, for all purposes, for total impairment of the cognitive powers, and when the 'irresistible impulse' test is added on to it, demands complete impairment of the volitional power as well." S. Oley Cutler, S. J., Insanity as a Defense in Criminal Law, 5–6 The Catholic Lawyer 44, 54.

"The law must recognize that when there is no black and white it must content itself with different shades of gray. The draft [ALI standard], accordingly, does not demand *complete* impairment of capacity. It asks instead for *substantial* impairment. This is all, we think, that candid witnesses, called on to infer the nature of the situation at a time that they did not observe, can ever confidently say, even when they know that a disorder was extreme." Comment on American Law Institute, Model Penal Code, supra, page 158.

In State v. Gramenz, 256 Iowa 134, 140, 126 N.W.2d 285, 289, defendant charged

with murder in the first degree asserted the court had not given him full benefit of the doctrine of diminished responsibility in its instruction to the jury. He had not urged insanity as a defense, but introduced testimony of a clinical psychologist and a psychiatrist relating to his mental condition. We recognized that there may be "different shades of gray" with reference to mental illness or unsoundness of mind. We said:

"We believe that failure to recognize there can be an unsoundness of mind of such a character as to negative a specific intent to commit a particular crime is to ignore the great advancements which have been made in the field of psychiatry. * * * We do not pretend that there are no mental disorders except those which qualify under this test, [M'Naghten] but rather limit the defense of insanity to the types of mental illness in which defendant cannot comprehend the nature or consequences of his act. Weihofen in his text Mental Disorder as a Criminal Defense states that if we recognize the basic principle that a person should not be punished for a crime if he did not entertain the requisite state of mind, 'there is no logical escape from the proposition that a person cannot be held guilty of a deliberate and premeditated killing when he did not deliberate and premeditate, and indeed was incapable of deliberating and premeditating. If, however, he was able to understand the nature of the act he was committing and if he intended to do that act, he should be held guilty of murder in the second degree or manslaughter. There is no logic in the "all or nothing" assumption underlying so many court opinions on the subject—that a person is either "sane" and wholly responsible for all his acts, or "insane" and wholly irresponsible.' "

We believe the distinction between Gramenz and this case is that there we were considering "diminished responsibility" as a partial defense on the issue of defendant's capacity to form a specific intent; here we are considering "absolute irresponsibility" as a complete defense.

In United States v. Chandler, supra, 393 F.2d at 926, Judge Haynsworth says of the ALI formulation:

"It substantially meets all of the criticism of the old rules and remedies their presently apparent deficiencies. It avoids the misunderstandings inherent in an undiscriminating use of the *Durham* prescription. For the present, for indiscriminate application, it is, in our opinion, the preferred formulation. With appropriate balance between cognition and volition, it demands an unrestricted inquiry into the whole personality of a defendant who surmounts the threshold question of doubt of his responsibility. Its verbiage is understandable by psychiatrists; it imposes no limitation upon their testimony, and yet, to a substantial extent, it avoids a diagnostic approach and leaves the jury free to make its findings in terms of a standard which society prescribes and juries may apply."

In Commonwealth v. McHoul, 352 Mass. 544, 226 N.E.2d 556, 560, the court said:

"Perhaps the single greatest point made for the Code definition [ALI] is that under it, experts will be unrestricted in stating all that is relevant to defendant's mental illness."

Judge Burger suggests "that the American Law Institute test is essentially a restatement, in modern psychiatric terms, of the M'Naghten *cognition* concept—described as 'capacity * * * to appreciate' —combined with the *volition* element of the irresistible impulse test also stated in modern medical terms as capacity to control behavior. Certainly these two factors lie at the heart of the problem." Psychiatrists, Lawyers, and the Courts, supra.

The same concept prevails in Massachusetts where the ALI definition is regarded as an evolutionary restatement of their rule rather than a substantive new rule which, of course, it is in those jurisdictions that adopted its dual test to replace the single cognitive test of the M'Naghten rule. See Commonwealth v. McHoul, supra, 266 N.E.2d at 558.

However, we "have rejected the 'irresistible impulse' modification except when it so operates upon a diseased mind as to destroy the comprehension of consequences." State v. Gramenz, supra, 256 Iowa at 138, 126 N.W.2d at 288, and citations.

In State v. Beckwith, 242 Iowa 228, 245, 46 N.W.2d 20, 30, we said:

" 'Irresistible impulse' can be a factor under our decisions when, and only when, it so operates upon a diseased mind as to destroy the comprehension of consequences; it is not, in and of itself, a defense. The Iowa law, as it now stands, excludes it in cases where the power to distinguish between right and wrong is present, but it is claimed that the overpowering passion made it impossible for the defendant to prevent commission of the act."

The adoption of the ALI standard would be a substantive new rule in Iowa extending absolute immunity from criminal responsibility to persons who, although capable of understanding the nature and quality of the acts (the ability to distinguish between right and wrong), are unable to control their own behavior as a result of mental disease or defect. See State v. White, 60 Wash.2d 551, 374 P.2d 942, 963.

" * * * The function of the test of responsibility is to identify those who, on the calm and sober view, must be regarded as ineligible for the processes of criminal justice with their inherent stigmatic and punitive ingredients and who, therefore, must be conceived solely as the recipients of care, custody, and therapy. The moral incongruity and inexpediency of subjecting such persons to the condemnatory procedures of the criminal law is a perception that has been given some form of expression in the Anglo-American law for the past seven hundred years. * * * The statement of the insanity defense thus must be of concern to anyone interested in achieving a full, rational, and sensible formulation of the law of criminal liability." 45–46 Marq.L.Rev., supra, page 496.

"Much of the conflict over the rules of criminal responsibility is attributable to a basic misconception as to the nature of the problem. Criminal responsibility is a legal not a medical question. [Wechsler, Insanity and the Criminal Law, 22 Univ. of Chicago L.Rev. 373] Involved is a legal consequence, not medical diagnosis. Indeed, we are told by recognized authorities that the word 'insanity' has no medical significance; that no such condition has been found; and 'that there are serious doubts that such condition exists. * * *

" * * * * * *

"The * * * [M'Naghten] test has withstood the onslaught of critics, not because it is scientifically perfect, but because the courts regard it as the best criteria [sic] yet articulated for ascertaining criminal responsibility which comports with the moral feelings of the community.

" * * * * * *

"Perhaps a revision of the rules of criminal responsibility would be forthcoming if the law felt it could place greater trust and confidence in psychiatry. The spectacle not only of individual psychiatrists in disagreement, but also entire divergent schools of thought is not an inspiring one. As one authority stated, '[P]sychiatry is still more of an art than a science.' " Sauer v. United States (9 Cir.), 241 F.2d 640, 648–650.

Appendix A, page 161 of tentative draft No. 4 of the Model Penal Code, lists thirty jurisdictions using the right-wrong test and fourteen more using it plus the irresistible impulse test. In Commonwealth v. McHoul, supra, 226 N.E.2d at 559, footnote 3, states adopting the ALI rule either by court decision or legislative enactment are set forth. State v. White, supra, 374 P.2d at 966–967, contains a criticism of "irresistible impulse" with citation of authorities and a suggestion M'Naghten can even help in the rehabilitation process by quoting from Sol Rubin, A New Approach to M'Naghten v. Durham, 45 J.Am.Jud. Soc'y 133, 136 (December, 1961).

"*  *  * Legal controls cannot be abandoned in response to the alleged findings of current science until it is ascertained whether the scientific knowledge necessary for effective operation of the new laws is actually available." Hall, Psychiatry and Criminal Responsibility, 65 Yale L.J. 761.

Because of the ever-increasing outcry for modification of conventional rules of criminal responsibility we have attempted to give each of the suggested standards a comprehensive review.

However, until such time as we are convinced by a firm foundation in scientific fact that a test for criminal responsibility other than M'Naghten will serve the basic end of our criminal jurisprudence, i. e., the protection of society from grievous antisocial acts, this court has decided to continue to submit the question of criminal responsibility on the issue of insanity to the jury by the time-tested M'Naghten rule expanded by the irresistible impulse theory within the restrictions announced in State v. Beckwith, supra, and cases following that decision.

The court did not err in refusing to instruct under the ALI standard.

The case is therefore

Affirmed.

All Justices concur, except BECKER and LeGRAND, JJ., who dissent.

BECKER, Justice.

I dissent.

The careful consideration of the M'Naghten rule, the American Law Institute rule, and the Durham rule leaves nothing to be desired in terms of attention to the issues and difficulties involved in this matter. My own view is that this court should adopt the American Law Institute test for this state. Further comment is unnecessary. The reasons for preferring the A.L.I. test have been made plain in the authorities cited by the majority.

LeGRAND, J., joins in this dissent.